**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ANDREW REVELLE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRANSUNION LLC,<br><br>Defendant. | Case No.: 25-cv-11268<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiff Andrew Revelle ("Plaintiff") brings this Class Action Complaint on behalf of himself, and all others similarly situated, against Defendant TransUnion LLC ("TransUnion" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to him, which are based on personal knowledge:

## NATURE OF THE ACTION

1. Credit reporting agencies, such as TransUnion, play a vital role in our economy. They collect large quantities of information about American consumers' financial lives; create detailed credit reports and scores based on this information; and, in turn, sell this information to lenders, landlords, potential employers, and others, who utilize this information to determine consumers' creditworthiness and reliability.

2. The information collected by credit reporting agencies, such as TransUnion, includes detailed personal information about consumers' financial and credit histories, including but not limited to names, current and former addresses, dates of birth, Social Security numbers,

phone numbers, and other financial information (collectively, "Personally Identifying Information" or "PII").

3. By collecting vast troves of sensitive information, TransUnion is well-aware of the responsibility it owes to individuals to whom that information relates stating that: "[t]he security and protection of personal data is our **highest priority**. We are committed to aligning with industry-leading leading, cyber risk management best practices and complying with all applicable legal and regulatory requirements."[1]

4. Despite TransUnion's representations, however, its data security obligations fell flat. On or about August 26, 2025, TransUnion began notifying consumers that Defendant had suffered a cybersecurity incident which impacted personal data on a third-party application used by TransUnion (the "Data Breach").[2] The Data Breach resulted in the compromise of the PII of approximately 4.4 million individuals.

5. While TransUnion has not yet disclosed the identity of the compromised, third-party applications, news sources have indicated that cybercriminals likely gained access to TransUnion's Salesforce Customer Relationship Management account through a successful social engineering attack.[3]

---

[1] *2024 Global Impact Report*, TransUnion, https://www.transunion.com/content/dam/transunion/global/business/documents/2024-global-impact-report.pdf, at 30 (emphasis added).

[2] *Data Breach Notifications*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html (last visited Sept. 3, 2025).

[3] Bill Toulas, *TransUnion suffers data breach impacting over 4.4 million people*, BleepingComputer (Aug. 28, 2025), https://www.bleepingcomputer.com/news/security/transunion-suffers-data-breach-impacting-over-44-million-people/.

6. The cybercriminals responsible for the Data Breach—the ShinyHunters extortion group—have claimed to have stolen 4.4 million records related to U.S. consumers, including Social Security Numbers stored in plain text.[4]

7. As a direct and proximate result of Defendant's failure to implement and follow basic, standard data security procedures, Plaintiff's and Class Members' PII has been compromised by cybercriminals.

8. The harm resulting from a data privacy breach manifests in numerous ways, including identity theft and financial fraud. The exposure of a person's PII through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitoring their credit, financial accounts, and email accounts, and taking a number of additional prophylactic measures.

9. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and similar forms of criminal mischief—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

10. Plaintiff, on behalf of himself and the Class as defined herein, brings claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, and declaratory judgment, seeking damages, with attorneys' fees, costs, and expenses, and appropriate injunctive and declaratory relief.

---

[4] *TransUnion notifying more than 4.4 million U.S. consumers of data breach (1)*, DataBreaches.Net (Aug. 28, 2025), https://databreaches.net/2025/08/28/transunion-notifying-more-than-4-4-u-s-million-consumers-of-data-breach/.

11. To recover from these harms, Plaintiff and the Class seek damages in an amount to be determined at trial, declaratory judgment, and injunctive relief requiring Defendant to: (1) investigate and disclose, expeditiously, the full nature of the Data Breach and the types of PII accessed, obtained, or exposed by the hackers; (2) implement improved data security practices to reasonably guard against future breaches of PII possessed by Defendant; and (3) provide, at Defendant's own expense, all impacted victims with lifetime identity protection services.

## PARTIES

12. Plaintiff is an adult, who at all relevant times is and was a citizen of the State of Wisconsin.

13. Defendant TransUnion LLC is Delaware limited liability company with a principal place of business located in Chicago, Illinois.[5]

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act because Plaintiff and at least one member of the Class, as defined below, are citizens of a different state than Defendant, there are more than 100 members of each of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

15. This Court has general personal jurisdiction over Defendant because TransUnion resides in the State of Illinois.

[5] Because jurisdiction is based on 28 U.S.C. § 1332(d), TransUnion's citizenship is based on its state of incorporation and the location of its principal place of business. *See Calchi v. TopCo Assocs., LLC*, 676 F. Supp. 3d 604, 614 (N.D. Ill. 2023) ("In the ordinary case, an LLC's citizenship is determined by the citizenship of each of its members. But in a CAFA case, an LLC's citizenship is determined by its state of organization and its principal place of business.").

16. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1), because TransUnion resides in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District; and TransUnion conducts substantial business within this District.

## STATEMENT OF FACTS

### A. The Role of Credit Reporting Agencies.

17. Credit reporting agencies play a vital role in the American economy. They act as intermediaries between borrowers and lenders, providing information needed to determine a borrower's creditworthiness by collecting and maintaining individuals' historical credit information.

18. Credit reporting agencies, such as TransUnion, collect information on individuals from "lenders, credit card companies, utility companies, and court records. This data is consolidated into credit reports that include a business' or individual's credit score."[6]

19. The information credit reporting agencies collect and maintain is highly sensitive, including individuals' names, Social Security Numbers, dates of birth, current and former addresses and other historical financial data such as information related to individuals credit accounts and items sent to collections.

### B. TransUnion Collects and Maintains Vast Amounts of Consumer Information.

20. TransUnion is one of the three major credit reporting agencies in the United States. TransUnion was originally formed as a holding company for Union Tank Car Company in 1968.

---

[6] *What is a Credit Reporting Agency: Understanding Its Role in Loan Approvals*, CRS (June 5, 2024), https://crscreditapi.com/what-is-a-credit-reporting-agency-understanding-its-role-in-loan-approvals/

The following year, TransUnion acquired the Credit Bureau of Cook County, which maintained 3.6 million credit accounts.[7]

21. In the decades following its formation, TransUnion continued to expand, reaching full coverage in the United States in the late 1980's, "maintaining and updating information on virtually every market-active consumer in the country."[8]

22. TransUnion has continued to expand its business over the years, and currently "collects and maintains credit information on over 1 billion consumers worldwide, with approximately 200 million of those based in the U.S."[9]

23. While TransUnion is considered the smallest of the three major credit bureaus, TransUnion reported net income of $284 million in 2024.[10]

24. As part of its credit reporting business, TransUnion collects and maintains the PII of millions of consumers, including their names, addresses, Social Security Numbers, dates of birth, employment history, and details on their financial histories, including balances, payment history, and loan information, including the PII of Plaintiff and Class Members.[11]

25. By virtue of participating in the U.S. credit market, Plaintiff and Class Members indirectly or directly entrusted their sensitive and confidential PII to TransUnion, and therefore reasonably expected that Defendant would safeguard their PII from unauthorized access.

---

[7] *About TransUnion*, TransUnion, https://www.transunion.com/about-us (last visited Sept. 15, 2025).

[8] *Id*.

[9] Toulas, n. 3.

[10] *TransUnion Announces Fourth Quarter and Full-Year 2024 Results and Refreshed Capital Allocation Framework*, TransUnion (Feb. 13, 2025), https://newsroom.transunion.com/transunion-announces-fourth-quarter-and-full-year-2024-results-and-refreshed-capital-allocation-framework/

[11] *Exploring Your Credit Report*, TransUnion, https://www.transunion.com/how-to-read-your-credit-report (last visited Sept. 15, 2025).

26. Due to the sensitivity of the PII that Defendant handles, collects, and stores, it is or should have been aware of its critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

27. By requesting, obtaining, collecting, storing, and deriving a benefit from Plaintiff's and Class Members' PII, TransUnion assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

**C. TransUnion Expressly Recognizes the Importance of Data Security**

28. TransUnion is well-aware of the foreseeability and repercussions of cybersecurity threats, including data breaches, having observed numerous other well-publicized data breaches involving major corporations over the years, including the data breach at fellow credit reporting agency, Equifax.

29. TransUnion expressly recognizes the importance of securing consumers' sensitive data, stating: "[t]he security and protection of personal data is our highest priority. We are committed to aligning with industry-leading, cyber risk management best practices and complying with all applicable legal and regulatory requirements" and further explaining that "[p]rivacy compliance is of paramount importance to TransUnion's ongoing success."[12]

30. TransUnion also represents that it is "organized to develop, implement and maintain a robust information security program consistent with TransUnion's size and complexity. We employ multiple, overlapping layers of security controls to reduce risks and vulnerabilities associated with single points of failure."[13]

---

[12] *2024 Global Impact Report* at 30, 37

[13] *Id.* at 31.

31. In addition to recognizing the importance of data security, TransUnion also expressly recognizes the foreseeability that it would be targeted by a cyberattack or that a third-party provider would be targeted by a cyberattack stating: “cyber risk within the financial services sector remains high due to increased frequency and sophistication of threats across multiple vectors, including supply chain and vulnerability exploitation, cybercrime and ransom operations.”[14]

32. Indeed, TransUnion specifically recognizes in its 2024 annual report that it faces significant cybersecurity risks:

> As a global consumer credit reporting agency and provider of risk and information solutions, we collect, store and transmit a large amount of sensitive and confidential consumer information on over one billion consumers, including financial information, personally identifiable information and protected health information. As such, we rely heavily on computer systems, hardware, software and technology infrastructure for both internal and external operations that are critical to our business. We face significant and evolving cybersecurity risks that threaten the confidentiality, integrity and availability of our systems and data including unintentional events and deliberate attacks by third parties or insiders, such as the exploitation of “bugs” or security vulnerabilities in software and hardware and sophisticated attack methods such as ransomware.[15]

33. And TransUnion further recognizes that “We experience numerous attempts to access our computer systems, software, networks, data and other technology assets on a daily basis. We have also experienced cyberattacks and other security incidents, and expect that such attacks and incidents will continue in varying degrees in the future.”[16]

34. Despite TransUnion’s asserted commitment to data security, Plaintiff’s and Class Members’ PII was accessed and stolen by cybercriminals.

---

[14] *Id*. at 33.
[15] *2024 Annual Report*, TransUnion,https://investors.transunion.com/~/media/Files/T/Transunion-IR-V2/annual-reports/2024/2024-annual-report.pdf, at 31.
[16] *Id.*

**D. The Data Breach.**

35. On or about August 28, 2025, TransUnion announced that it had suffered a cybersecurity incident that impacted the personal information of consumers that was stored on a third-party application that was serving its U.S. customer support operations.

36. According to TransUnion, the Data Breach occurred on July 28, 2025 and was discovered two days later.[17] TransUnion has reported that the Data Breach impacted over 4.4 million consumers in the U.S.

37. While TransUnion claims "no credit information was accessed" during the Data Breach, TransUnion later reported the categories of impacted PII to the Texas Attorney General's Office, including consumers' names, dates of birth, and Social Security Numbers.[18]

38. While TransUnion has not disclosed the name of its compromised third-party application, news reports have indicated that the Data Breach is linked to TransUnion's use of Salesforce's Customer Relationship Manager.[19]

39. On or about the same day that TransUnion announced the Data Breach, the Shiny Hunters extortion group took responsibility for the attack, claiming to have stolen over thirteen million records, including 4.4 million records from the U.S. alone, from TransUnion's Salesforce CRM.. The group further alleged that the stolen information included Social Security Numbers stored in plain text and threaten to leak the stolen data on a forum called "BreachStars."[20]

---

[17] Toulas, n. 3.
[18] Zack Whittaker, *TransUnion says hackers stole 4.4 million customers' personal information*, TechCrunch (Aug. 28, 2025), https://techcrunch.com/2025/08/28/transunion-says-hackers-stole-4-4-million-customers-personal-information/
[19] *TransUnion notifying more than 4.4 U.S. million consumers of data breach (1)*, n. 4.
[20] *Id*.

40. Based on news reports to date, cybercriminals intentionally accessed Defendant's Salesforce CRM in an attack designed to access Plaintiff's and Class Members' valuable PII stored therein, and that these malicious actors were successful in the attack.

41. According to news reports, the Data Breach is linked to a wave of cyberattacks by the ShinyHunters extortion group who have been using voice phishing attacks to target Salesforce customers to steal data from companies' Salesforce CRM.[21]

42. In these Salesforce attacks, the threat actors have impersonated IT support personnel, requested that the targeted individual accept a connection to a Salesforce Data loader, "a client application that allows users to import, export, update, or delete data within Salesforce environments."[22]

43. More specifically, the threat actors persuaded the targeted individual(s) to visit Salesforce's connect app setup page, and, once there, the target was asked to enter a "connection code" which is linked to a malicious version of Salesforce's Data Loader.

44. Once the threat actors' Data Loader has been connected to the victim's environment, the threat actors use the Data Loader to export data from companies' Salesforce CRM.[23]

45. Since these attacks have begun, Salesforce has emphasized that its platform itself has not been breached, but rather individual customer accounts have been breached via social engineering attacks.

---

[21] Toulas, n. 3.
[22] Bill Toulas, Google: Hackers target Salesforce accounts in data extortion attacks, BleepingComputer (June 4, 2025), https://www.bleepingcomputer.com/news/security/google-hackers-target-salesforce-accounts-in-data-extortion-attacks/.
[23] *Id*.

46. Indeed, earlier this year on March 14, 2025, Salesforce warned customers that threat actors had been engaging in voice phishing attacks, and urged customers to strengthen their security posture to prevent social engineering attacks by:

a. Enforcing trusted IP ranges for logins;

b. Following the principle of least privilege for app permissions;

c. Enabling multi-factor authentication (MFA);

d. Restricting use of connected apps and managing access policies;

e. Using Salesforce Shield for advanced threat detection, event monitoring, and transaction policies; and

f. Adding a designated Security Contact for incident communication.[24]

47. Upon information and belief, the Data Breach is the result of Defendant's failure to implement adequate data security measures, including one or more of Salesforce's own recommendations to its customers.

**E. The Risks of Storing Valuable PII are Well-Known to TransUnion**

48. Given TransUnion's role in handling sensitive consumer data, Defendant was well aware at all relevant times that the PII that it obtains, collects, stores, uses, and derives a benefit from is highly sensitive and of significant value to those who seek to use it for wrongful purposes.

49. Defendant also knew that a breach of its computer systems, or its third-party accounts, and the resulting exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII.

---

[24] *Protect Your Salesforce Environment from Social Engineering Threats*, Salesforce (March 12, 2025), https://www.salesforce.com/blog/protect-against-social-engineering/.

50. These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at financial services companies, including: CapitalOne, KeyBank, Equifax, Flagstar Bank, and TMX Finance Corporate Services. These breaches put Defendant on notice that its electronic records would be targeted by cybercriminals.

51. In addition, in recent years, numerous high-profile data breaches have occurred as a result of third-party tools, including Progress Software Corporation (MOVEit file transfer software); Fortra (GoAnyWhere file transfer software); CLEO (file transfer software), and Snowflake (cloud storage accounts). These breaches again put Defendant on notice that its electronic records stored on third-party systems would be targeted by cybercriminals.

52. PII has considerable value and constitutes an enticing and well-known target for hackers. Hackers can easily sell stolen data, as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[25]

53. Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available.

54. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2024, there were 6,670 recorded data breach

[25] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

incidents, exposing over 16.8 billow records. The United States specifically saw a 12% year-over-year increase in data breaches as compared to 2023.[26]

55. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, approximately 2.675 million people reported some form of identity fraud compared to approximately 6.5 million people in 2024.[27]

56. The financial sector is also a prime target for threat actors. Between January 2018 and September 2023, financial companies have suffered 2,260 data breaches, impacting over 232 million records.[28]

57. The financial sector is "disproportionately targeted by threat actors" because of a simple rationale: "[t]hreat actors target organizations that have what they want and what pays big – data and money. Data can be sold for money and vulnerabilities that enable access to both data and money."[29]

---

[26] *2025 Global Threat Intelligence Report*, Flashpoint, https://go.flashpoint.io/2025_GTIR at 6 (last visited Sept. 15, 2025).

[27] *Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20 Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Sept. 15, 2025); *Current Graph, Identity Theft And Fraud Reports, 2020-2024*, Insurance Information Institute, https://www.iii.org/graph-archive/96074 (last visited Sept. 15, 2025).

[28] Paul Bischoff, *Financial data breaches accounted for 232 million leaked records from January 2018 to September 2023*, Comparitech (Oct. 4, 2023), https://www.comparitech.com/blog/vpn-privacy/financial-data-breaches/#:~:text=2%2C260%20financial%20data%20breaches%20 from,over%20101%20million%20in%20total.

[29] Jen Miller-Osborn, *3 Reasons Cyberattacks Target Financial Services and How to Fight Back*, Paloalto Network (Aug. 31, 2021), https://www.paloaltonetworks.com/blog/2021/08/financial-services-cyberattacks/.

58. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

59. **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

60. The Social Security Administration warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> You should know that other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make it more difficult for you to get credit.[30]

61. Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be

[30] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

62. Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even where cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of PII to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

63. The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

64. Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account takeovers, medical identity fraud, tax refund fraud, and buy now pay later frauds.[31] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[32]

---

[31] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.

[32] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

65. Based on the value of individuals' PII to cybercriminals, and the foreseeability of a data breach, Defendant knew or should have known the importance of safeguarding the PII entrusted to it and of the foreseeable consequences that would arise if its data security systems were breached. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**F. TransUnion Failed to Comply with FTC Guidelines and Industry Best Practices**

66. Defendant is prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

67. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[33]

68. In 2016, the FTC updated its publication titled Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[34] The guidelines recommend that businesses implement the following:

a. Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

---

[33] *See Start with Security: A Guide for Business* (June 2015), Federal Trade Commission, available at: https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

[34] *See Protecting Personal Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), Federal Trade Commission, available at: https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

b. Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c. Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

d. Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

e. Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.[35]

69. In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[36]

70. Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

[35] *Id.*

[36] *See Start with Security: A Guide for Business*, n. 33.

71. Upon information and belief, Defendant failed to properly implement one or more of the basic data security practices recommended by the FTC. Defendant's failure to employ reasonable and appropriate data security measures to protect against unauthorized access to individuals' PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

72. Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[37]

73. NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[38] Upon information and belief, Defendant failed to adhere to the NIST guidance.

74. Further, cybersecurity experts have identified various best practices that should be implemented by entities in the financial industry, including the following:

i. Regularly assessing risks and auditing cybersecurity;

ii. Establishing a cybersecurity policy;

iii. Appointing a data protection officer;

iv. Securing networks;

v. Verifying user identities;

---

[37] *See Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards & Technology (Apr. 16, 2018), App'x A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

[38] *Id.* at Table 2, 26-43.

vi. Establishing secure password management;

vii. Continuously monitor user activity; and

viii. Manage third-party risks.[39]

75. Upon information and belief, Defendant's failure to protect Plaintiff's and Class Members' PII is a result of its failure to adopt and follow reasonable safeguards as required by the FTC, NIST, and industry best practices.

**G. TransUnion is Subject to, and Failed to Comply with, the GLBA.**

76. The Gramm-Leach-Bliley Act ("GLBA"), states that "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

77. A "financial institution" is defined as "any institution the business of which is engaging in financial activities as described in section 1843(k) of title 12." 15 U.S.C. § 6809(3)(A). Defendant is considered a financial institution for purposes of the GLBA as TransUnion is significantly engaged in financial activities. *See* 12 U.S.C. § 1843(k)(4).

78. "Nonpublic personal information" means "personally identifiable financial information provided by a consumer to a financial institution; resulting from any transaction with the consumer or any service performed for the consumer; or otherwise obtained by the financial institution." 15 U.S.C. § 6809(4)(A)(i)–(iii). The PII involved in the Data Breach constitutes "nonpublic personal information" for purposes of the GLBA.

---

[39] Yana Storchak, *12 Best Practices for Banking and Financial Cybersecurity Compliance*, Syteca (April 2, 2025), https://www.syteca.com/en/blog/banking-and-financial-cyber-security-compliance.

79. Defendant collects "nonpublic personal information," as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) & 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period, Defendant was subject to the requirements of the GLBA, 15 U.S.C. §§ 6801, *et seq*., and is subject to numerous rules and regulations promulgated under the GLBA.

80. The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 & 314.4. As alleged herein, Defendant violated the Safeguards Rule.

81. Defendant's conduct resulted in a variety of failures to follow GLBA mandated rules and regulations, many of which are also industry standard. Among such deficient practices, the Data Breach demonstrates that Defendant failed to implement (or inadequately implemented) information security policies or procedures such as effective employee training, adequate intrusion

detection systems, regular reviews of audit logs and records, and other similar measures to protect the confidentiality of the PII it maintained.

82. Had Defendant implemented adequate data security protocols, the consequences of the Data Breach could have been avoided, or at least significantly reduced as the Data Breach could have been detected earlier, the amount of PII compromised could have been greatly reduced.

**H. Plaintiff's Experience.**

83. Upon information and belief, as part of Plaintiff's engagement in the credit market, TransUnion collected and maintained Plaintiff's PII. In collecting, maintaining, using, and deriving a benefit from Plaintiff's PII, TransUnion undertook a duty to act reasonably in its handling of Plaintiff's PII. Defendant, however, did not take reasonable care of Plaintiff's PII, leading to its exposure and compromise as a direct and proximate result of Defendant's inadequate security measures.

84. On Friday, September 5, 2025, at 11:49 pm, Plaintiff received an alert that his credit card was being used for a transaction that was fraudulent. Plaintiff declined the transaction and was then forced to shut down his credit card and request that a new card be issued. Plaintiff thus lost access to his only currently active credit card.

85. A few days later, Plaintiff received from TransUnion a Notice of Data Breach dated September 2, 2025, indicating that his PII collected and maintained by Defendant had been compromised in the Data Breach, specifically including his Social Security number and his date of birth. Plaintiff filed a police report noting the Data Breach and the credit card fraud he had experienced shortly after the Data Breach.

86. A few days after that, on approximately September 11, 2025, Plaintiff received from TransUnion a second Notice of Data Breach, also dated September 2, 2025, with a different

reference number above his name and address, but otherwise identical to the first Notice, again confirming that his Social Security number and date of birth were compromised in the Data Breach.

87. It took Plaintiff approximately two weeks to receive his replacement credit card. Since this was his only currently active credit card, he was forced to borrow cash from multiple friends during the week he did not have access to his credit card.

88. As a direct and proximate result of the Data Breach, Plaintiff has suffered actual injury from having his PII exposed and/or stolen as a result of the Data Breach, including: (a) responding to actual credit card fraud including but not limited to time and effort to cancel his misused credit card, having to wait two weeks to obtain a replacement card, borrowing money while waiting for the new card to arrive, and changing all his automatic payments to the new card once it arrived; (b) time and effort to mitigate the risk of additional misuse of his PII; (c) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web;(d) loss of privacy; and (e) out-of-pocket expenses in mileage costs driving to the police station to file his police report and driving to his friends' houses to borrow cash while waiting for his replacement credit card.

89. Further, knowing that hackers accessed and exfiltrated his PII, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience frustration, worry, and stress.

90. As a direct and proximate result of the Data Breach, Plaintiff has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending and is not speculative given the highly sensitive nature of the PII compromised in the Data Breach.

**I. Plaintiff and Class Members Suffered Damages.**

91. For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class members significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

92. Once PII is exposed, there is virtually no way to recover the data or prevent future misuse. This is especially true here, where the information stolen during the Data Breach has been leaked on the dark web and remains available to download. As a result, Plaintiff and Class members must maintain heightened vigilance indefinitely. Further, Plaintiff and Class members have not been compensated for the unconsented and unauthorized disclosure of their PII, for which there is a robust market.

93. As a direct result of the Data Breach, Plaintiff and Class members have suffered and will continue to suffer economic and other concrete harms, including but not limited to:

a. Unauthorized disclosure of their confidential information;

b. Loss of the control of their PII;

c. Identity theft, fraud, and misuse of medical and financial information;

d. Out-of-pocket expenses for credit monitoring, mitigation efforts, and fraud prevention tools;

e. Unauthorized charges and restricted access to financial accounts;

f. Emotional distress, anxiety, and loss of privacy;

g. Time and productivity lost dealing with the consequences of the breach;

h. Damage to credit scores, including from fraudulent inquiries; and

i. Continued and imminent risk of future fraud and identity theft due to their data being in the hands of unauthorized third parties.

94. Individuals suffer harm each time their personal data is compromised and circulated on underground markets—even if they have been affected by prior breaches. The dark web contains vast, fragmented repositories of stolen information that can be aggregated by different criminals for varied forms of fraud. Each subsequent breach increases the likelihood that a victim's sensitive data will be accessed by more actors and exploited in new and damaging ways.

95. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. There may also be a significant time lag between when personal information is stolen and when it is misused for fraudulent purposes.

96. Plaintiff and Class members place significant value on data security and consider a company's ability to protect personal information a key factor in their purchasing decisions. Many consumers are willing to pay more for services from organizations that demonstrate strong cybersecurity practices. Conversely, consumers are far less likely to share personal data with companies that have suffered a data breach—reflecting the reputational damage and business consequences that flow from failing to safeguard sensitive information.

97. By collecting and storing Plaintiff's and Class members' sensitive information, Defendant undertook a duty to safeguard it and avoid increasing the risk of identity theft or fraud. Because Defendant failed to uphold that duty, Plaintiff seeks the present value of identity protection services and other compensatory measures to address the current and future harm stemming from the Data Breach.

98. Additionally, Plaintiff and Class members are entitled to recover the reasonable use value of their PII that was accessed and exfiltrated without authorization. This form of compensation mirrors damages awarded in intellectual property cases for unauthorized use of intangible assets. As with a patent or trade secret, PII are non-rivalrous: their unauthorized use by a third party does not eliminate the owner's ability to use them but still justifies compensation based on market value.

99. TransUnion continues to retain the PII of Plaintiff and Class Members. As long as Defendant maintains possession of this information, Plaintiff and Class members have a strong and ongoing interest in ensuring that adequate safeguards are in place to prevent further unauthorized access or disclosure.

## CLASS ACTION ALLEGATIONS

100. Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class defined as:

> All individuals in the United States whose PII was compromised in the Data Breach of which TransUnion noticed on or about August 28, 2025.

101. Excluded from the Class is Defendant, its subsidiaries and affiliates, their officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded

party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

102. Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

103. **Numerosity.** The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including, but not limited to, the files implicated in the Data Breach. Based upon public filings, the Class includes approximately 4.4 million individuals.

104. **Commonality.** This action involves questions of law and fact that are common to Plaintiff and the Class members. Such common questions include, but are not limited to:

a. whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class members;

b. whether Defendant was negligent in collecting and storing Plaintiff's and Class members' PII;

c. whether Defendant had duties not to disclose the PII of Plaintiff and Class members to unauthorized third parties;

d. whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class members' PII;

e. whether Defendant failed to adequately safeguard the PII of Plaintiff and Class members;

f. whether Defendant breached its duties to exercise reasonable care in handling Plaintiff's and Class members' PII;

g. whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. whether Plaintiff and Class members are entitled to damages as a result of Defendant's wrongful conduct; and

i. whether Plaintiff and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

105. **Typicality.** Plaintiff's claims are typical of the claims of the Class members. The claims of Plaintiff and Class members are based on the same legal theories and arise from the same failure by Defendant to safeguard their PII. Plaintiff and Class members directly and/or indirectly entrusted Defendant with their PII, and it was subsequently compromised by an unauthorized third party.

106. **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

107. **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

108. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duty, then Plaintiff and each Class member suffered damages by that conduct.

109. **Injunctive Relief.** Defendant has acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

110. **Ascertainability.** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class members may be readily identified through Defendant's books and records, including the files implicated in the Data Breach.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

111. Plaintiff restates and realleges all preceding allegations as if fully set forth herein.

112. Defendant owed a duty under common law to Plaintiff and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and protecting their PII in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

113. Specifically, this duty included, *inter alia*: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's and Class members' PII was adequately secured and protected; (b) implementing processes that would detect a breach of its security systems in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

114. Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

115. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting, storing, and processing valuable PII that is routinely targeted by cybercriminals, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

116. Defendant also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's conduct included its failure to adequately

restrict access to its computer networks, servers, and/or cloud computing accounts that held individuals' PII.

117. Defendant also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures to protect that PII, and the frequency of cyberattacks such as the Data Breach that target third-party service providers.

118. Defendant breached the duties owed to Plaintiff and Class members and thus were negligent. Defendant breached these duties by, among other things: (a) mismanaging its systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies provided to customers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

119. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class members, their PII would not have been compromised.

120. As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered injuries including:

a. theft of their PII;

b. unauthorized charges to their bank and credit card accounts;

c. costs associated with canceling and ordering new payment cards;

d. time spent reporting fraudulent activity;

e. costs associated with requesting credit freezes;

f. costs associated with the detection and prevention of identity theft;

g. costs associated with purchasing credit monitoring and identity theft protection services;

h. lowered credit scores resulting from credit inquiries following fraudulent activities;

i. costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

j. the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

k. damages to and diminution in value of their PII directly or indirectly entrusted to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class members' data against theft and not allow access and misuse of their data by others; and

l. continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class members.

121. As a direct and proximate result of Defendant's negligence, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

122. Plaintiff restates and realleges all preceding allegations as if fully set forth herein.

123. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as TransUnion for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duties.

124. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect customers' PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach.

125. Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

126. Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against

businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

127. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

128. The GLBA states "that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

129. Defendant violated the GLBA and the Safeguards Rule by failing to use reasonable measures to protect PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and disclosed and the foreseeable consequences of a data breach.

130. Plaintiff and Class Members are consumers within the class of persons the GLBA and the Safeguards Rule was intended to protect.

131. Moreover, the harm that has occurred is the type of harm that the GLBA and the Safeguards Rule were intended to guard against.

132. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 117 above.

133. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**UNJUST ENRICHMENT**

**(On Behalf of Plaintiff and the Class)**

134. Plaintiff restates and realleges all preceding allegations as if fully set forth herein

135. Plaintiff and Class members have an interest, both equitable and legal, in the PII about them that was conferred upon, collected by, and maintained by TransUnion and that was ultimately stolen in the Data Breach. This PII was conferred on TransUnion in most cases by third-parties but in some instances directly and/or indirectly by Plaintiff and Class members themselves.

136. TransUnion benefitted from the conferral upon it of the PII pertaining to Plaintiff and Class members and by its ability to retain and use that information. TransUnion understood that it was in fact so benefitted. Indeed, TransUnion's business would not exist but for the need to collect, maintain, and sell Plaintiff's and Class members' PII to facilitate transactions between lenders and borrowers.

137. TransUnion also understood and appreciated that the PII pertaining to Plaintiff and Class members was private and confidential and its value depended upon TransUnion maintaining the privacy and confidentiality of that PII.

138. But for TransUnion's willingness and commitment to maintain its privacy and confidentiality, that PII would not have been transferred to and entrusted with TransUnion. Further, if TransUnion had disclosed that its data security measures were inadequate, TransUnion would not have been permitted to continue in operation by regulators, its shareholders, and participants in the marketplace.

139. As a result of TransUnion's wrongful conduct as alleged in this Complaint, including its implementation of inadequate data security measures, TransUnion has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class members. Among other

things, TransUnion continues to benefit and profit from the collection, maintenance, and sale of the PII while its value to Plaintiff and Class members has been diminished.

140. TransUnion's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and Class members' sensitive PII, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

141. Under the common law doctrine of unjust enrichment, it is inequitable for TransUnion to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiff and Class members in an unfair and unconscionable manner. TransUnion's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

142. The benefit conferred upon, received, and enjoyed by TransUnion was not conferred officiously or gratuitously, and it would be inequitable and unjust for TransUnion to retain the benefit.

143. Plaintiff is without an adequate remedy at law.

144. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm, including those identified in paragraph 117 above.

145. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that they unjustly received from them.

## FOURTH CAUSE OF ACTION

**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

146. Plaintiff restates and realleges all proceeding factual allegations as if fully set forth herein.

147. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

148. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class members' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their PII. Plaintiff alleges that Defendant still possesses Plaintiff's and Class members' PII, and that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

149. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, *inter alia*, the following:

a. Defendant owes a legal duty to secure consumers' PII under the common law and Section 5 of the FTC Act; and

b. Defendant continues to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class members' PII.

150. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

151. If an injunction is not issued, Plaintiff and Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at TransUnion. The risk of another such breach is real, immediate, and substantial. If another breach at TransUnion occurs, Plaintiff and Class members will not have an adequate remedy at law because the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

152. The hardship to Plaintiff and Class members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal. Defendant has a pre-existing legal obligation to employ such measures.

153. Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by possibly preventing another data breach at TransUnion, thus eliminating the additional injuries that would result to Plaintiff and consumers whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief as follows:

A. for an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B. for an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. for damages in an amount to be determined by the trier of fact;

D. for an order of restitution and all other forms of equitable monetary relief;

E. declaratory and injunctive relief as described herein;

F. awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

G. awarding pre- and post-judgment interest on any amounts awarded; and

H. awarding such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated: September 17, 2025

Respectfully Submitted,

By: */s/ Maureen Kane Berg*

Maureen Kane Berg (IL Bar No. 6200319)
Karen H. Riebel (*pro hac vice forthcoming*)
Kate M. Baxter-Kauf (*pro hac vice forthcoming*)
Emma Ritter Gordon (*pro hac vice forthcoming*)
Jacob E. Lanthier (*pro hac vice forthcoming*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Phone: (612) 596-4097
Phone: (612) 596-4037
khriebel@locklaw.com
kmbaxter-kauf@locklaw.com
mkberg@locklaw.com
erittergordon@locklaw.com
jelanthier@locklaw.com

**Counsel for Plaintiff and the Proposed Class**